Good morning, Your Honor. If it please the Court, Carrie Leonetti on behalf of Luis Aguilar. As one initial matter before I launch into my argument, I want to bring to the Court's attention that I cited a case, Bird v. Lewis, in my opening brief. Last month, this Court withdrew and deferred that opinion pending a Supreme Court cert grant in an unrelated case. So for the time being, it is not presidential authority. Bird v. Lewis. On June 10th, this Court withdrew and deferred it pending the Supreme Court's decision in Polito. What is the Supreme Court case about? I'm actually not sure it's even the same question for which I cited it. It was a habeas case, and I believe the Supreme Court question involves AEDPA review, but it's just not precedential, so I don't want to. With that, I would actually like to start at the end of my brief with the sentencing issue. And more specifically, the question of whether the 100-month sentence imposed in this case was reasonable, both procedurally reasonable and substantively reasonable. I think that the Ross case from the Seventh Circuit that I cite in my brief is particularly parallel to what happened at the sentencing proceeding with Mr. Aguilar. The Court's comments in this case, while perfunctorily acknowledging the advisory nature of the guidelines, then went on to indicate, I think clearly, that the Court misunderstood really what advisory guidelines meant. When the Court stated in evaluating the mitigation evidence that the focus is where within the guideline range the sentence should be, and that the substantial mitigating evidence provided by the defense was the reason why it warranted a sentence at the low end of the range. This is the same subtle error that the Seventh Circuit pointed to in Ross as evidence that the Court violates the procedural process that we follow in light of Rita Gall and Kimbrough. And then there's simply the substantive unreasonableness of this sentence. It was uncontested, and Judge O'Neill specifically found that Mr. Aguilar remained in Mexico for several years after his last removal, and more importantly, that he returned to the United States at the request of his daughter's neurologist at Central Valley Children's Hospital to assist in the care for serious seizure disorder, that he was the only parent that the children had and legal guardian, and that he went to the United States Embassy in Mexico City and applied for an emergency visa that was denied before he returned. And it seems to me that the procedural and the substantive errors in reasonableness overlap in this way. If one doesn't follow the right procedure and recognize that substantial mitigation allows you to go below the low end of the guidelines, you're going to end up hammering a guy with mitigation this serious. And when you have mitigation this serious and someone gets a hundred-month sentence for an immigration violation, probably the correct procedure wasn't followed. The procedural error is when the Court specifically says in rendering his sentence, this mitigation goes to where within the guideline range I sentence, and the mitigation is the reason why I'm sentencing at the low end of the guideline range. That is a misunderstanding of advisory sentencing guidelines. You take them into consideration, but if you think there's substantial mitigation and you credit it, as Judge O'Neill did as a factual matter, you have to recognize your span in a case like this is zero to 20. And the mitigation goes to where in the zero to 20 you sentence, even though you can take into consideration the guideline range. The problem, of course, is that the judge did go on at some length about the fact that when he came back to see his sick daughter, committed a number of crimes, and the judge seemed quite frustrated by it all, and at one point said, there does not appear any way to protect the public from your criminal activity, and we know that deportation did not do it. So it doesn't seem like a unthinking conclusion that he deserves some mitigation, but not all that much. That's possible, but I still think you have to go to his explicit statement of, this determines where I sentence within the range, because that simply isn't an advisory guideline scheme. And if this person doesn't get below the 100 months, you have a de facto mandatory application of the guidelines in the Eastern District of California in violation of the Sixth Amendment. So the mitigation was just the most substantial mitigation I think I've ever seen in 100 of these cases. Now, to go to the issue of the trial issues. Have you seen anyone that has gone back and forth, deported and returned and returned? Oh, certainly, Your Honor. I would say that probably characterizes the typical 1326 prosecution. With regard to the trial issues, the only material facts that were at issue in this case was the identity of the person put over the border in San Diego in 91, in El Paso in 93, and in San Diego again in 98. That was the material disputed fact at issue. With regard to the prior conviction evidence, what the government puts in evidence is documents relating to three different AFILs. In Alameda County conviction documents from 1991, they would relate to the San Diego deportation out of AFIL 1. The New Mexico conviction documents from 92, they relate to AFIL 2, the 93 deportation. Alameda County from 92, that would go back to AFIL 1. And inexplicably, Kings County conviction documents from AFIL 3, with which Mr. Aguilar is never charged. The government's theory of the admissibility of these prior convictions, I believe is a textbook exercise in circular logic. We know that these convictions are Mr. Aguilar's convictions because they're found in Mr. Aguilar's A-files. We know these are Mr. Aguilar's A-files because his convictions are contained inside of them. The only issue is who is the person in 91, 93, 98, escorted to the border, put across, and waved goodbye to. The existence of these conviction documents in the files simply don't speak to that issue. Kagan. Well, they speak to it a little bit, but the question is really a 403 problem. They speak to it in the sense that they create some circumstantial evidence. I agree. That the person who they were deporting was the person who was convicted because they were trying to deport a person who had been convicted rather than just any random person. I agree. And they also link up the fingerprints to some more documents, i.e., this person has fingerprints not only in his deportation documents but also in the conviction documents. So the question is. Well, I agree, and I didn't raise a 401 objection in the brief because relevancy is a pretty minimal threshold. They don't all have fingerprints. In fact, only about two of the pages and pages and pages of documents do. But it seems to be that the Court's ruling of what this opening-the-door doctrine that's sometimes called curative admissibility could almost be characterized as punitive admissibility, as in you tiptoed over by the closet counsel and now every skeleton in that closet comes in in front of the jury. And I think the only thing more concerning with the disproportionality of what the door is supposedly opening to is how prevalent this conventional wisdom is with trial courts that if you get near a subject, anything on that subject suddenly comes in under 403, under 404B. And I think the scope of what comes in is the best evidence of how far away we are from both 403 and 404B with the admission of this evidence. Yes, they involve balancing tests. Yes, when a fact is at issue, it may affect the probative versus prejudicial nature of something or the special relevancy. But admitted in these documents are, first of all, documents that don't have any fingerprints on them, for the most part. Second of all, documents containing all kinds of extraneous facts. The detention status of the defendants in these cases. One alleges a bond violation that happened in the case. You have sentencing documents showing 18-month sentences. You have charging documents, complaints alleging priors as sentencing enhancements. You have indications of West pleas that it was a nolo contendere subject to a plea agreement. And in two of the judgment and sentence that you'll find in Exhibits 16 through 20 in the Excerpt of Record, you will find a judge making an explicit finding at sentencing that there was no mitigation for sentencing in these cases. That can't possibly be relevant. And more importantly, it can't possibly overcome the balancing test of 403 or the demands of 404B. In addition, with regard to 404B, you have the glaring problem that I don't think the government even really deals with, that there's no pretrial notice of this. In fact, the government gave pretrial notice. They were not putting in 404B evidence. There was a pretrial stipulation that the prior convictions would come in only under Rule 609 if Mr. Aguilar testified, which he did not, in exchange for which I stipulated under Almandaz-Torres they could come in at sentencing under the prior conviction exception to Apprendi. And so Judge O'Neill never even deals with the fact that there was pretrial notice. They would not use these convictions for 404B material. And instead, I would urge you to look at the pages of the Excerpt of Record that deal with Exhibits 16 through 20 and look at the bulk of the material, including, by the way, most importantly of all, Exhibits 16 and 17. Exhibits 16 and 17 are what are called penitentiary packets. They were mailed to the investigating agent from a penitentiary in New Mexico. They allege, the government's theory is that these are convictions from Mr. Pena. Mr. Pena is the individual in A File 3. Mr. Aguilar was never charged with anything from A File Number 3. None of the immigration documents from A File Number 3 were admitted at trial, but a pen packet from a penitentiary in another state comes in relating to an individual with a crime that Mr. Aguilar isn't — an immigration crime that Mr. Aguilar isn't even charged with committing. This is way beyond specific impeachment. This is way beyond curative admissibility. If there's any relevancy to some of these documents, it is certainly horribly outweighed by the prejudice to the jury. I think the — But curative admissibility usually deals with curing neuroneous admissibility. Exactly, Your Honor. And that's what's mystifying to me, is the cross-examination that supposedly opens the door is basically bringing out that they have at one point in time four A Files that eventually get consolidated, but four A Numbers, three physical A Files. That's completely accurate. I mean, I'm at a loss for what you're curing by admitting prior conviction documents. There's really no question the INS bookkeeping was a disaster in this case at best. So I'm not sure what misleading impressive they're curing at all. It seemed to me that you argued and perhaps continue to argue that fingerprint evidence alone isn't enough for identity. So if fingerprint evidence — and I gather there's some case law saying this. So if fingerprint — so simply the fact that these deportation documents had his fingerprints wasn't going to do it. They needed something else. And so what else did they — could they have other than some — now, they may have gone overboard, but some connection up to the convictions to demonstrate a — that the person who was being deported was a person who had also been convicted of the charges that were being mentioned in the deportation documents. I mean, that is a connection, and it does demonstrate that this person is more likely to be the same person. Well, first of all, they had a written confession that they admitted at the first trial that ended in a deadlock jury that they didn't admit in evidence at the second trial. You have to address to the government why not. That would seem to be pretty good evidence they can use other than this. And that was with regard to the 1998 deportation, which was the most shaky. Well, given the picture on the file, right, it's certainly a concern given the 1998 deportation warrant. I'm also not sure I'd agree with the characterization that I argued fingerprint testimony wasn't enough. I think there are serious concerns with the fingerprint testimony that came out of the mouth of this witness. I mean, I think it was incredibly concerning and contradicted by the photograph on the 1998 warrant, which would seem to be the more conclusive evidence. It's awfully hard to shrink eight inches in a matter of a few years. So I'm not sure it was a sufficiency of the evidence issue, but I think it's a problem when you use these AFAL documents that are written and old and not well kept. The short answer is you could bring in the agent. I mean, you could bring in an agent to identify the person who they put across the border if they can. And if they can't, I think the hearsay implications of the documents become more serious, particularly for constitutional purposes. If somebody can't come in and just say, yes, that's the person in 1998 I put across the border, why are we letting documents alone, particularly documents kept in this manner, speak for themselves? And I think the problem with the prejudice from the prior convictions is related to the prejudice from some of the jury instruction issues, particularly the response to the jury's notes and the refusal to give a specific instruction on what removal means. Because it seems to me that what the jury ---- they didn't buy the 1998 deportation anyway. Well, they deadlocked on it. They didn't. It's not like they rendered a not guilty verdict. But it seems to me even if they had, that's inconsistent in the sense that the government's theory is the fingerprints are the same on the confession that they took in 2006 and the three AFAL sets of documents. And if the jury doesn't believe that the fingerprint matches in 1998, I'm not sure how they can then base a finding that he's the guy in 91 and 93 on the fingerprints that their own expert testify is identical. And it seems to me that the jury notes reflect the confusion the jury is having, I think, globally in this trial, is what do we do with a paper prosecution? Here we have all these documents that seem to indicate this person's in custody in two places at the same period of time. What does custody mean? And the judge refuses to instruct them that it means physically the State of California took a prisoner from New Mexico under the interstate agreement on detainers. And the same thing with the theory of the defense. They're asked to find he was removed, but they're never told removal means this is the guy we took in the van and put across the border. And they're wrestling with what to do with all these papers that are in files and that have fingerprints on them. But what is the government's burden of proof when a jury is never told removal means removal and custody means custody? It allows them to find that if Mr. Aguilar's ---- And help if the judge said removal means removal. Because it seems to me without that instruction, if the jury decides that Mr. Aguilar is the guy the INS is trying to ---- I mean, that's all the judge has to say? Removal means removal? Well, yes. Under case law, removal means the physical, personal removal of the person subject You just totally undermine your own point, because if removal means removal, then saying removal is removal. No. I mean, I think you have to give the ---- the instruction I requested is it's a physical removal of a person out of the country subject to some kind of immigration order that's valid. And so ---- But the point is that that's what almost anybody would think. So if you were to define it the opposite way, that would be one thing. But if you're telling ---- if you tell an ordinary person that this person was removed, it means he was gone. Except custody means custody. And the jury is sending notes asking what does custody mean. And it seems to me the jury could believe Mr. Aguilar is the person at whom these immigration orders are directed, even if he's not necessarily the person who goes across the border, and find him guilty without an instruction on what removal means for the purpose of immigration proceedings. Because it is a term of art. And I don't think it's one you can assume the jury understands without an instruction. So the judge sort of sent back a note that said, in response to your question, removal means removal. No, Your Honor. There's a ---- That's what you said, and that's what ---- Well, I'm using shorthand in a short argument with a long brief. Okay. But there's actually a copy of the specific definition of removal that I asked to be given in the excerpt of record. And it is consistent with Casilla-Baza and some of this Court's other cases. Because there is actually clarification of what a removal means for the purpose of a 1326 prosecution for returning. And with regard to the jury note, what the judge needed to advise was it means actual physical custody. Because that is, as a legal matter, what 3755 means in the State of California. And finally, I would like to quickly get to the discovery argument. Because I think it is the discovery argument about the computer searches that were done in this case. Because I think it is concerning. I think there's an analogy that can be made with a lineup. If instead of using immigration files, the government were using three eyewitnesses for these three removals, and they conducted a lineup with Mr. Aguilar in it, and the three witnesses picked Mr. Aguilar out, I think it's without question that I'd be entitled to see what the composition of the lineup was and how it was done. Because if the other five people in the lineup are tall, blonde women, that's exculpatory or at least impeachment material. If one or two of the witnesses paused for a really long time on another person, maybe another person named Juan Sanchez, and then picked Mr. Aguilar, that's likely to lead me to exculpatory or impeachment material. And I think conceptually in this case, what we have is essentially a computer lineup. You have an agent sitting down at a computer. He's culling through possible suspects. He's picking the ones he thinks matches. And I have no way to know who he's eliminated or how he's made that decision. He testifies. Matters if he used a hyphen or not. Matters if there's a blank space. Well, what happens if you run a hyphen? Or what happens if he didn't run a hyphen? And, you know, ultimately what I want to know is, did he hit on anyone six foot four who lives in New Mexico or who lives in Alameda County? That's someone I want to investigate as the possible person who's in the picture of the warrant in 98 and may be the same individual who was deported in 91 and 93. And it's really no different conceptually. And it seems to me. The problem is that he wasn't, in fact, in the picture in 91 and 93. And the fingerprints do match throughout the various A file documents as I understand it. So it's an extremely implausible hypothesis. I mean, the only thing that seems to have happened is that perhaps there was a problem with this one photograph. But other than that, no. Well, except the real question isn't that they find all the A files. The question is, how come when someone's picked up in 93, if he's the same guy in 91, they don't match him? How come when he's picked up in 98, they don't match him to either of the two 93 files? They match him back to 91. At some point when those removals were going on, someone in the INS made a determination that this wasn't the same individual. That's actually where the problem happens. It's the creation of the A files, not the finding of them going into this trial. And as you pointed out, Your Honor, the jury wasn't terribly convinced by the fingerprint evidence because they didn't find he was the guy in 98, even though Kinney clearly testifies the fingerprint matches. So the question is, why do these multiple A files get created in the first place? And either it's a horrible breakdown in bookkeeping and INS, which is the same INS that now wants us to believe this is the individual that they removed and they've located, or it wasn't, or a correct determination was made in 93, 93, and 98 that they hadn't seen this guy before, in which case I think I'm entitled to discovery of who those other people might have been that had their own A files created. And with that, I'd like to reserve the rest of my time for rebuttal. Okay. Good afternoon, Your Honors. May it please the Court. My name is Ian Garrickson. I represent the United States in this matter. This is actually a really simple case, despite the litany of issues raised by appellant. The issues are the defendant was convicted by overwhelming evidence of the violation of 8 U.S.C. 1326 in that the defendant was an alien, was previously removed from the United States, was later found in the United States, and did not have permission. As appellant's counsel said right now, the only issue was the removal. The defendant admitted that he was an alien. There was evidence that he was found, the case agent found him in the United States, and there was testimony that there was no permission in his immigration files for him to return to the United States. The only issue is the removal, removals. And the evidence on this point is overwhelming, and the government was entitled to put on overwhelming evidence in this case to rebut any claims made by defendants saying that the government was so overwhelming, why did you need to put all these convictions on? It's always, you know, interesting to me when the government stands up and says this was overwhelming, but meanwhile you're fighting to get evidence in that's, you know, at least sort of problematical, and if you could have done without it, then why didn't you do without it? First, the government introduced several, the warrants of deportation from 1991, 93, and 98, and explained the A files that were in there. Appellant's counsel on cross-examination began to elicit a number of grounds as to the different A files, different names on the immigration files. But the fingerprints matched up and down, right? Yes, on all the warrants of removal. And they matched his fingerprints as taken shortly before the trial? Yes, Your Honor. All right. So why didn't you need anything else? Because the defendant at that point, the appellant, was attacking the credibility of the government's case agent, his credibility of the way he searched and found. For instance, with the third A file, the A file where there were no warrants of removal indicted. Well, what do the convictions do for that? The conviction issue is the only issue, it seems to me. Because the names on the conviction, in each A file, when an individual is deported, in this case, Mr. Aguilar, in order to show cause, was issued in most of the deportations saying you are such and such an individual, you've been charged with this crime. In one case in New Mexico, a specific conviction, code section, date, New Mexico, in another order to show cause, in California, the Alameda County conviction. And with the OSC, there was the order to show cause, the warrant of removal, and also in the file was, in several of the files, was the actual conviction document, because that was the basis upon which that individual at the time was removed from the United States as an aggravated felon. Well, actually, you only need one removal, don't you? Correct, Your Honor. But the government is entitled to put on its entire case and the number of removals that it could establish. And I guess Judge Berzon's question is why on earth would you put on the 1998 one where the pictures showed one guy as being 5'11", the other one 6'4"? Because in this case, the government was also, as the government's counsel in this case explained to the trial court, the government is also required to show that the defendant did not have permission to reenter the United States. And that required showing that there were no other immigration files out there that might have contained permission received by the appellant to enter the United States. And that was that burden on the government. Were some of the convictions that were introduced not the subject of any of the OSCs? Excuse me, Your Honor. Were some of the convictions introduced not the subject of any of the OSCs? There were four convictions admitted into evidence after the appellant attacked the credibility of the case agent and the investigation, the immigration files. And if I can just go warrant of removal by warrant of removal, the first 1991 removal, there was a fingerprint and photograph. The name on that was Juan Sanchez Saragosa. That cited an Alameda County conviction, and that file contained a conviction. The 1993 removal document, that A file, it cited a conviction in New Mexico, and the case agent went ahead and ordered the penitentiary packet, which provided fingerprints and photos, which additionally supported the case that this was, in fact, the individual. On as with regards to the third A file, which was in the name of Francisco Cuevas Pena, the government found that A file based on an alias listed on one of the conviction documents or the OSC in the 1998. In the 1998, it's a little confusing, but I believe it's well set forth in the government's brief. But there was often the name, Juan Sanchez Saragosa, but also an alias listed, Francisco Pena. By that alias, the government was able to find the third A file under Francisco Cuevas Pena. And each of the convictions that were ordered contained fingerprints. Well, not all of them, but two of them. Kagan. You still haven't answered my question. Was there any conviction that was introduced that was not the subject of a deportation? The removal? Yeah. I was going to say that there was one, and I'm asking, was there one? That could be the case, Your Honor. But the issue here is not whether or not he was deported based on these convictions. The issue was it was in the trial court's wide discretion to allow the government to reestablish the credibility of its case agent to say how. I'm really mystified about it. I understand that you were trying to demonstrate that he, that these, I'm really not at all sure how it goes to his credibility anyway, but you were trying to demonstrate that there was a connection between certain convictions and certain deportations in order to demonstrate, as I understand it, that the person who was deported was the person who was convicted, which makes it more likely that it's actually him because he was the person who was convicted. I gather that's what you're saying. I don't know what that has to do with credibility exactly. But in any event, if one of those doesn't connect up, then it shouldn't have been admitted. And similarly, is it also true that a lot of the actual material in these documents has nothing to do with identity? With regard to your first question, they are all, were all a part of the government's means of reestablishing the credibility because on each of those cases. Well, you could say that, but I don't understand why. You're not telling me why. Because the convictions, they contain names. For instance, the name Francisco Pena, which was also listed in another A file as an alias of the defendant. So then he may not have been deported on a particular conviction. The government does, did prove or did know that on the two occasions, 93 and 91, he was deported for these certain convictions. But that's not really the issue of whether or not he was deported on these grounds. The issue is that those convictions were used to link him to all the other, to the A files and immigration records based on the names used in those convictions. What difference does that make? You don't need that. Do you have a burden of proof to show that he didn't have permission to reenter? Yes. The government. You do? The government had to show that the defendant was an alien, was removed, later found in the U.S., and did not have permission. And the government did have to show that as the appellant continually attacked the number of A files that were out there, the government didn't know whether or not. So I understand, therefore, why you have to prove all the A files, but I don't understand why you have to prove all the convictions. But also, what about the suggestion that there were a, there was a lot of material on these conviction documents that didn't have anything to do with his identity, such as what he pled and how long his sentence was for and so on? First of all, on that issue, certain of those issues were discussed between the defense counsel and the government counsel at that point with the trial court. When the government moved, asked the court repeatedly that we're going to want to admit these convictions, the defense counsel at that point did object to certain parts of the convictions coming in, bond information, what have you, and parts of the convictions were kept out. And that is in the record in the trial transcript. And if she's now, if the appellant's now arguing that other parts of the convictions shouldn't have come in, she could have, the appellant could have raised those at that time. So she didn't do that? She did to a degree. And the parts that she object, that appellant objected to were kept out. And that's in the record, certain parts of the conviction. If you articulate, you know, as clearly as you can, how this went to the credibility of the, first of all, in what sense this credibility was attacked, and secondly, how the convictions went to his credibility. As I say, I can understand how they went to the underlying fact, but I'm having trouble seeing how it went to his credibility. First, the government put on its evidence of the removals and why all of the, though there were three removals and two varying, different names. And then the appellant on cross-examination asked numerous questions as to why these, there were different A files as appellants raised here. Why weren't they consolidated? Why weren't they digitized? Were they kept in paper format? They're paper clipped. There's a typographical error on one, which was actually corrected. It wasn't really his credibility that she was attacking. It was simply the, whether these documents prove what they appear to prove. The credibility. But it's not his credibility. It wasn't, she wasn't claiming he was lying. But it's the credibility of the documents and the proof those were valid documents as well. But also the credibility of his investigation and his thoroughness in looking for all potential under aliases that the defendant used, to make sure there was no other immigration file out there with a permission for him to return to the United States. But the conviction documents didn't go to any of that, right? The conviction documents did because they showed why the third A file under Francisco Cuevas-Pena was actually found by the case agent. Because there was an alias in the 1998. But the convictions didn't go to whether there was some other A file out there. It showed how the case agent conducted his investigation. And it wasn't just random that the government found all these A files. It connected each of the A files. And that it wasn't just that he's the most unluckiest guy in the world. The stars line up. And his name happens to be, and his fingerprints happen to be on all these conviction documents. Because the appellant attacked both the credibility of the case agent's and the accuracy of the records. And it was that point in the trial court's wide discretion to say, well, you have invited the government to reestablish the credibility of the government. And for instance, on the third A file, the government never brought that up on its direct examination of the case agent. The appellant brought that out, trying to show that the government just happened to find this third A file. And it was the appellant that brought that out, that it came out later, that this third A file. So you're saying that the pertinence of the convictions was not to establish who this person was, but rather to demonstrate how the case agents had found the various A files. Excuse me, Your Honor. It actually went to both issues, that this was actually the individual, because part of the defendant's attack was this not only was it the defendant was arguing that it's not only a poor investigation, but also that it's a different individual in each of the removals. But the government ---- But that doesn't go to credibility as a case agent. I'm really having a lot of trouble with this. The conviction documents show with the photos, the photographs, the court should keep in mind that with the penitentiary packets from New Mexico and California, they both contain photographs as well as the defendant. And that evidence went to the jury. And because the names, the convictions that were in those immigration files, a case agent ordered the penitentiary packs that came back with photos and additional fingerprints. And all of those fingerprints matched between all of the convictions that were related between the A files. The 1998 one as well? Fingerprints matched? There was a fingerprint on the 1998 warrant of removal. All of the fingerprints in this case matched, Your Honor. The only additional ---- I'm concerned with 98. The 98 removal, that fingerprint matched on that? On the removal document, Your Honor? Yeah. Yes. They all matched the fingerprint. How about the photograph? How did he grow 5 inches between 93 and 98? As was responded to by the defense expert, there was no testimony as to whether or not the, you know, the poofiness of the hair, shoes. There was no specific evidence showing that the inch markers on those photos were accurate. And that was a jury issue. That was a jury issue to look at. We have the photographs on the room. Ms. Leonetti also said that some of the conviction documents didn't have fingerprints. Is that so? There were two. The conviction documents in the A files, there would be a conviction document, abstract of judgment. They did not have a fingerprint. They had the name. The case agent ordered a penitentiary pack, both penitentiary packet from the correctional department in New Mexico and California. And they keep a record of the fingerprints associated with it. Right. She said some of the convictions were accompanied by fingerprints in the end and some were not. Is that right? Correct. Correct. But the reason the ones that may not have had fingerprints, the names, it showed that the defendant used it. Because you have one A file, one removal, where the defendant's deported under the name Luis Aguilar Zaragoza. But there's a conviction document perhaps showing he has that name and an alias. In another A file, which contains another removal, there's a conviction document or removal under that name. And that's the reason to connect the names. It connects the names, but it doesn't connect to him. It connects the names. The photos connected to him. The jury could determine whether or not this was the same man. On two of the removal documents, there were photos. They heard testimony that the fingerprints in all the removals were the same and with the convictions, that this was indeed the same individual. You started out by saying this was a pretty simple case. It looks like a factually complicated case. It's made more complex than it should be. The case is that the defendant with the ---- Let me give you your best. As I understand, and as Judge Haga seems to have alluded, that, you know, if you look at the removal documents, the fingerprints are consistent throughout. And you had your expert testify. I mean, and he was pretty thoroughly cross-examined, and some of his testimony was a little questionable. All of that was matters for the jury to decide. And, you know, you look at all the documents that the old INS had, the new agency has today, and you don't get a great deal of comfort in them. But nonetheless, all of that was presented to the jury, and it was for the jury to decide whether to, you know, find that they were trustworthy, I guess. So you had the fingerprints, which were consistent throughout. You had the testimony of the expert. It was submitted to the jury, and the jury made a finding. Right. At least as to two. Correct. Two removals. Correct. So isn't that, I mean, isn't that your whole case? That is the case. And it just gets complicated because you had, as Judge Hugg said, you had to go in, or as Judge Brezon said, for whatever reason, whatever tactical strategy there was, and like Judge Brezon says, I'm just not sure why you would need to pursue it, you got it diverted with all this conviction records. The government did not intend to introduce the conviction. Appellant's counsel points out that the government didn't give pretrial notice. The government gave notice that it was only intending to put on the convictions to impeach the defendant if he testified. This was all only in rebuttal to the attack on the credibility of the agent. Well, that's what you're saying, but I'm having a hard time understanding. As I keep saying, I understand how it went to the merits, but I'm having a hard time seeing how it went to the credibility of the particular witness. Of the case agent? Because the case agent was, I tried to set this forth before, but the appellant attacked the case agent's method of putting all the A files together and also the government's files in general. And this was an issue that's subject to abuse of discretion review and it's in the latitude of the trial court. Well, it didn't prove the records were good. The records were pretty lousy. What it proved was that there was some extra record material from which he could demonstrate that, in fact, he was the same person. I mean, the fact that you had to go to these pen packs demonstrates itself that the records were pretty lousy by themselves in terms of demonstrating that he was who he said he was. Well, you say he was. The case agent also did testify that the names are often provided by the aliens themselves and can be false. And so in this case, I mean, there was, you know, inaccurate information provided by the aliens. Well, obviously that's true, yes. Correct. And they have to establish that these files are connected. Furthermore, there is no injustice in this case. As the appellant's already noted and the Court has already recognized, he confessed that the case agent testified that he confessed to being previously removed. The case agent testified that he had used the names Juan Sanchez Zaragoza. She said that it wasn't introduced. I mean, I'm only repeating what she says about the records because I don't know. At the second trial, the case agent testified that the defendant used the name Juan Sanchez and Luis Aguilar. It was introduced at the first trial. The reason that's brought up and the appellant brought up, so I'm bringing it up again, is that there's no, as far as the Brady argument goes, that there's some figure lurking out there named Juan Sanchez who's getting deported all the time, committing these, you know, doing these crimes. The defendant's already admitted his name was Juan Sanchez. So it's just a matter of if you look at if there's any argument of injustice, it's just invalid because he's already admitted he's used that name. He was previously removed. And there are several other points raised by the appellant, but I believe those points are accurately and sufficiently addressed in the government's record. And if the Court has no further questions, the government will submit it. Thank you. Thank you. If I could just on some of the factual issues of the prior convictions. Exhibits 14 and 15, they begin on page 160 of Volume 2 of my excerpt of record. Those are the conviction documents for Pena. That is the case that he was never charged with any removal, so there was no OCS in. And, in fact, Judge O'Neill's ruling in admitting those documents specifically was this. Exhibit 14 is indicated. Exhibit 15 is indicated. The Court finds there is relevance to it, not necessarily on the issue of an element of the crime, but rather on the credibility of Van Horn, which is being attacked. So even Judge O'Neill found he wasn't charged with anything related to Exhibits 14 or 15, and it wasn't really relevant to an element of the offense. What about the other material that you claim was over-admitted? Did you object to it? Yes, I did. And he's right. There was a discussion of some redaction, but, again, 17 and 18, which are the J and C's that relate to A files 1 and 2, had no fingerprints on them. And that was the argument was, you know, this is beyond the fact of conviction, and they don't have any fingerprints on them anyway. So they really don't get the government anywhere farther than they needed to be. And I'm glad you're confused by the credibility argument. There was a sidebar where I said, I'm not attacking his credibility. I think my point is he's extremely diligent to find this stuff in the horrible INS bookkeeping system. So I have never understood how this rehabilitated his credibility. I didn't even think I attacked Agent Van Horn's credibility. I simply drew out the manner in which the bookkeeping happened. And with regard to the confession, it was not in evidence at the second trial. And just to be clear, the confession that was admitted at the first trial was the confession to the 1998 Sanchez deportation, the photo on the warrant for which shows somebody 6 feet 4 inches tall. So there was no confession admitted at all in the second trial, and there never was a confession to any of the really the disputed ones in 91 and 93 of which she was convicted. Thank you. Okay. Thank you. Appreciate your arguments. The matter is submitted. And that ends our session for the day.
judges: Hug, Paez, Berzon